**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

KIMBERLY CHUNG, derivatively on behalf of
UPSTART HOLDINGS, INC.,

        Plaintiff,

        vs.

JEFF HUBER, KERRY COOPER, SUKHINDER
SINGH CASSIDY, HILLIARD TERRY, MARY
HENTGES, CIARAN O'KELLY, DAVID
GIROUARD, PAUL GU, ROBERT SCHWARTZ,
and SANJAY DATTA,

        Defendants,

        and

UPSTART HOLDINGS, INC.,

        Nominal Defendant.

**Case No.: 2:22-cv-3620**

<u>**JURY TRIAL DEMANDED**</u>

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Kimberly Chung ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Upstart Holdings Inc. ("Upstart" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Jeff Huber, Kerry Cooper, Sukhinder Singh Cassidy, Hilliard Terry, Mary Hentges, Ciaran O'Kelly, David Girouard, Paul Gu, Robert Schwartz, and Sanjay Datta (collectively, the "Individual Defendants," and together with Upstart, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Upstart, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"),

1

and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Upstart, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Upstart's directors and officers from March 18, 2021 to May 9, 2022 (the "Relevant Period").

2.      Founded in April 2012, Upstart is a lending platform that partners with traditional banking institutions to underwrite loans by using artificial intelligence ("AI"). The Company's original business model offered "Income Share Agreements" whereby individuals would receive money as part of an agreement to pay back the balance as part of their future income. However, in May 2014, Upstart abandoned this business model and re-cast its focus on offering more conventional personal loans.

3.      The Company offers loans directly on its website and through its banking partners' websites. Upstart receives revenue primarily through the fees paid by banks for their use of Upstart's AI software. For its part, Upstart claims the AI software "improve[s] access to affordable credit while reducing the risk and costs of lending for our bank partners." Upstart further claims that its AI software is more accurate than traditional loan underwriting processes, thereby

producing lower risk loans to banks and higher approval rates for customers.

4.      Upstart's AI software considers data such as where a potential borrower attended college, their GPA, their standardized test scores, and their work history, in addition to the traditional data sets such as credit score and income, when evaluating a potential borrower's creditworthiness.

5.      Upstart's business model relies on processing large amounts of loans and then shipping the loans off to its partner banks in order to avoid having to list the loans on the Company's balance sheet. Upstart maintained that the Company would rarely directly fund loans on its balance sheet, and primarily would fund loans for research and development in an effort to improve the AI software's capabilities.

6.      For that reason, Upstart appeared, at first glance, as a largely safe, insulated, and low-risk investment. In addition, Upstart boasted that its AI software provides "superior loan performance" and is "significantly more accurate than traditional lending models."

7.      However, these assurances were hollow. In truth, Upstart's AI software was not capable of addressing crucial changes in the economy such as rising interest rates, inflation, and injections of government-funded stimulus money, such as the COVID-19 relief program.

8.      Because of these shortcomings, Upstart granted loans with low creditworthiness, which required the Company to fund the loans from its balance sheet so that the loan quantity remained high to ensure the Company's business model's stability.

9.      In result, Upstart faced remarkable credit risk while investors were led to believe the Company faced a very low credit risk. Because of this, Upstart's stock traded at artificially inflated prices at all relevant times.

10.      When Upstart released first quarter 2022 earnings, on May 9, 2022, the Company

acknowledged that the loans on the Company's balance sheet more than doubled in one quarter. Defendant Sanjay Datta ("Datta"), the Chief Financial Officer ("CFO") stated the "balance of loans, notes, and residuals at the end of the quarter was…up to $604 million from $261 in Q4." Defendant Datta blamed the loan balance spike on "rising interest rates and rising consumer delinquencies putting downward pressure on conversion."

11.     Upstart also disclosed that despite the Company's balance sheet was "historically" almost only used for research and development, in the first quarter of 2022 the Company used the balance sheet "to do…sort of a market clearing mechanism" in an act to maintain loan volume and prop up the Company's business model.

12.     In the same release, Upstart brought to light that the Company's loan modification policy was recently "loosened" so that borrowers would have an easier time obtaining forbearance on loan payments. In effect, this disguised the amount of delinquent loans the Company faced by changing "delinquent" status loans to "current" status loans.

13.     In response to this development, Upstart chopped its revenue forecast by $150 million and issued bleak revenue forecasts for the second quarter of 2022 that were well under analysts' forecasts.

14.     On this news, Upstart's share price dropped $43.52 per share, or over 56%, from an opening price of $77.13 on May 9, 2022 to close at $33.61 on May 10, 2022.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements and omissions regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that

failed to disclose, *inter alia*, that: (1) Upstart's AI software was incapable of considering several relevant and important factors in determining loan creditworthiness; (2) as a result, Upstart faced harmful effects on its conversion rate; (3) as a result, Upstart would increasingly rely on its balance sheet to fund loans; (4) due to the foregoing, the Individual Defendants misrepresented the Company's true capabilities in approving and executing loans; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.     The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

18.     Moreover, during the Relevant Period, five of the Individual Defendants breached their fiduciary duties by engaging in insider sales for proceeds in excess of $375 million.

19.     In addition, the Individual Defendants violated Section 14(a) of the Exchange Act by causing the Company to issue the Company's Schedule 14A filed on April 5, 2022 (the "2022 Proxy Statement"), which contained false and misleading statements and omissions of material fact.

20.     In light of the Individual Defendants' misconduct, which has subjected the Company to a securities class action, which names Upstart co-founder and Chief Executive Officer ("CEO") Dave Girouard and CFO Sanjay Datta as defendants (the "Securities Class Action"); the need to undertake internal investigations; the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust

enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the two officers and directors' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Upstart's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

23.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     The Court has personal jurisdiction over each Defendant named herein because

each Defendant is an individual or corporation who has sufficient minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District because Upstart maintains its largest office in this District, which functions as one of the Company's two headquarters. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28.     Plaintiff is a current shareholder of Upstart common stock. Plaintiff has continuously held Upstart common stock at all relevant times.

### Nominal Defendant Upstart

29.     Upstart is a Delaware corporation with its principal executive offices at 711 N. High St., Columbus, Ohio 43215. Upstart's shares trade on the NASDAQ under the ticker symbol "UPST."

### Defendant Huber

30.     Defendant Jeff Huber ("Huber") has served as a Company director since June 2021. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of March 15, 2022, Defendant Huber beneficially owned 102 shares of the Company's common stock, which represented less than one percent of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 15, 2022 was $97.48, Defendant Huber owned approximately $9,943 worth of Upstart stock.

31.     For the fiscal year ended December 31, 2021, Defendant Huber received $170,708 in total compensation, including $16,285 in salary and $154,423 in option awards.

32.     The 2022 Proxy Statement said the following of Defendant Huber, in relevant part:

Mr. Huber has served as a member of our Board since June 2021. Mr. Huber has served as a founder and partner of Triatomic Capital, a private investing firm, since March 2022. From 2016 to 2021, Mr. Huber served as the Founding Chief Executive Officer and Vice Chairman of GRAIL, Inc., a life sciences company. From 2003 to 2016, Mr. Huber served as Senior Vice President of Alphabet Inc. (formerly Google Inc.). From 2001 to 2003, Mr. Huber served as Vice President of Architecture and Systems Development at eBay Inc., an e-commerce company. Prior to joining eBay, he was Senior Vice President of Engineering at Excite@Home. Mr. Huber is a board member of Electronic Arts (EA), a video game company. Mr. Huber holds a B.S. in Computer Engineering from the University of Illinois and an M.B.A. from Harvard Business School.

### Defendant Cooper

33.     Defendant Kerry Cooper ("Cooper") has served as a Company director since March 2021. Defendant Cooper also serves as the Chair of the Compensation Committee. According to the 2022 Proxy Statement, as of March 15, 2022, Defendant Cooper beneficially owned 2,474 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2022 was $97.48, Defendant Cooper owned approximately $241,166 worth of Upstart stock.

34.     For the fiscal year ended December 31, 2021, Defendant Cooper received $221,817 in total compensation, including $28,219 in salary and $193,598 in option awards.

35.     The 2022 Proxy Statement said the following of Defendant Cooper, in relevant part:

Ms. Cooper has served as a member of our Board since March 2021. Ms. Cooper has served as an executive-in-residence with the Acrew Diversify Capital Fund, a growth-stage fund, since January 2021. She served as President and Chief Operating Officer of Rothy's, a direct-to-consumer footwear company, from November 2017 to January 2020. Before joining Rothy's, Ms. Cooper was Chief Executive Officer of Choose Energy, a consumer services energy company, from 2013 to 2016. She is currently a director of PG&E Corp., an energy-based holding company, and TPB Acquisition Corp I. Ms. Cooper holds a B.S. in Mechanical Engineering from University of Texas at Austin and an M.B.A. from Harvard Business School.

### Defendant Cassidy

36.     Defendant Sukhinder Singh Cassidy ("Cassidy") has served as a Company director since February 2020. Defendant Cassidy also serves as the Chair of the Compensation Committee. According to the 2022 Proxy Statement, as of March 15, 2022, Defendant Cassidy beneficially owned 123,729 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2022 was $97.48, Defendant Cassidy owned approximately $12,061,103 worth of Upstart stock.

37.     For the fiscal year ended December 31, 2021, Defendant Cassidy received $317,744 in total compensation, including $69,000 in salary and $248,744 in option awards.

38.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Cassidy made the following sale of the Company's common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| November 19, 2021 | 5,000 | $211.76 | $1,058,800 |

Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

39.     The 2022 Proxy Statement said the following of Defendant Cassidy, in relevant part:

Ms. Singh Cassidy has served as a member of our Board since February 2020. Since June 2015, Ms. Singh Cassidy has served as the founder and chairman of the Boardlist, and in February 2021 began serving as a Founding Venture Partner of the Acrew Diversify Capital Fund, a growth-stage fund. Ms. Singh Cassidy served as the President of StubHub Inc., a technology company, from May 2018 to May 2020. From 2011 to September 2017, Ms. Singh Cassidy served in various roles at Joyus, Inc., an internet video shopping network, most recently as founder and chairman. From 2003 to 2009, she served in various senior executive roles at Alphabet Inc. (formerly Google Inc.), a technology company, most recently as President of Asia Pacific and Latin America Operations. Earlier in her career, she co-founded fintech pioneer Yodlee, Inc, which went public in 2014. She is currently a director of Urban Outfitters, Inc. Ms. Singh Cassidy previously served

on the board of Tripadvisor, Inc. and the board of Ericsson until 2018. Ms. Singh Cassidy holds a B.A. in Business Administration from the Ivey Business School at Western University.

**Defendant Hilliard Terry**

40.     Defendant Hilliard Terry ("Terry") has served as a Company director since February 2019. Defendant Terry also serves as the Chair of the Audit Committee. According to the 2022 Proxy Statement, as of March 15, 2022, Defendant Terry beneficially owned 68,295 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 15, 2022 was $97.48, Defendant Terry owned approximately $6,657,397 worth of Upstart stock.

41.     For the fiscal year ended December 31, 2021, Defendant Terry received $298,744 in total compensation, including $50,000 in salary and $248,744 in option awards.

42.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Terry made the following sale of the Company's common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| November 11, 2021 | 60,000 | $255.71 | $15,342,780 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

43.     The 2022 Proxy Statement said the following of Defendant Terry, in relevant part:

Mr. Terry has served as a member of our Board since February 2019. Mr. Terry has served as an advisor and interim CEO to private equity-backed portfolio companies. From January 2012 to October 2018, he served as Executive Vice President and Chief Financial Officer of Textainer Group Holdings Limited, an intermodal marine container management and leasing company. Before joining Textainer, Mr. Terry was Vice President and Treasurer of Agilent Technologies, Inc., which he joined in 1999, prior to the company's spinoff from Hewlett-Packard Company and initial public offering. He previously held positions in investor relations and/or

investment banking with Kenetech Corporation, an alternative energy company; VeriFone, Inc., a payments company; and Goldman Sachs & Co., a financial services firm. Mr. Terry is currently a director of Asbury Automotive Group, an automotive retailer, where he serves on Compensation and Human Resources Committee and the Capital Allocation & Risk Management Committee and Umpqua Holdings Corporation, a bank holding company, where he chairs the Audit and Compliance Committee and serves on the Nominating & Governance and Strategy Committees. Mr. Terry holds a B.A. in Economics from the University of California, Berkeley and an M.B.A. from Golden Gate University.

### Defendant Hentges

44.     Defendant Mary Hentges ("Hentges") has served as a Company director since December 2019. Defendant Hentges also serves as a member of the Audit Committee. According to the 2022 Proxy Statement, as of March 15, 2022, Defendant Hentges beneficially owned 98,295 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2022 was $97.48, Defendant Hentges owned approximately $9,581,797 worth of Upstart stock.

45.     For the fiscal year ended December 31, 2021, Defendant Hentges received $288,744 in total compensation, including $40,000 in salary and $248,744 in option awards.

46.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hentges made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 15, 2021 | 30,000 | $249.55 | $7,486,500 |

Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

47.     The 2022 Proxy Statement said the following of Defendant Hentges, in relevant part:

11

Ms. Hentges has served as a member of our Board since December 2019. Ms. Hentges served as the Interim Chief Financial Officer for ShotSpotter, a precision-policing solutions company from October 2020 to January 2021. Ms. Hentges previously served as the Chief Financial Officer of Yapstone, Inc., a financial services company, from 2012 to 2014, the Chief Financial Officer of CBS Interactive, a media company, from 2010 to 2012, and the Chief Financial Officer of PayPal, Inc. from 2003 to 2010. She is also a Certified Public Accountant (inactive). Ms. Hentges holds a B.S. in Accounting from Arizona State University.

### Defendant O'Kelly

48.     Defendant Ciaran O'Kelly ("O'Kelly") has served as a Company director since April 2018. Defendant O'Kelly also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2022 Proxy Statement, as of March 15, 2022, Defendant O'Kelly beneficially owned 192,745 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2022 was $97.48, Defendant O'Kelly owned approximately $18,788,783 worth of Upstart stock.

49.     For the fiscal year ended December 31, 2021, Defendant O'Kelly received $296,744 in total compensation, including $48,000 in salary and $248,744 in option awards.

50.     The 2022 Proxy Statement said the following of Defendant O'Kelly, in relevant part:

Mr. O'Kelly has served as a member of our Board since April 2018. From August 2020 to September 2021, Mr. O'Kelly was a full-time employee of Block, Inc. From 2009 to 2013, Mr. O'Kelly served in various roles at Nomura Securities, a financial services firm, most recently as Senior Managing Director and Head of Equities, Americas. Prior to 2009, Mr. O'Kelly served in various roles at two financial services firms, Bank of America, including Head of Global Equities and Head of Equity Capital Markets, and Salomon Smith Barney, including Head of Equity Trading. He also was previously a director of the technology company Square Financial Services, Inc., Bank of America Securities and Nomura Securities International. Mr. O'Kelly holds a B.B.S. in Business Studies from Dublin City University.

**Defendant Dave Girouard:**

51. Defendant Dave Girouard ("Girouard") is a Company co-founder, the CEO, and a director since the Company began. According to the 2022 Proxy Statement, as of March 15, 2022, Defendant Girouard beneficially owned 12,469,877 shares of the Company's common stock, constituting 14.46% of the total common outstanding stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2022 was $97.48, Defendant Girouard owned approximately $1,215,563,610 worth of Upstart stock.

52. For the fiscal year ended December 31, 2021, Defendant Girouard received $14,955,933 in total compensation, including $455,000 in salary, $7,830,650 in option awards, and $6,670,282 in stock awards.

53. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Girouard made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 1, 2021 | 137,498 | $225.71 | $31,034,811 |
| October 1, 2021 | 12,498 | $309.23 | $3,864,806 |
| October 1, 2021 | 125,000 | $300.32 | $37,540,625 |
| November 1, 2021 | 12,498 | $330.56 | $4,131,326 |
| November 1, 2021 | 125,000 | $333.92 | $41,739,750 |
| December 1, 2021 | 12,498 | $202.55 | $2,531,419 |
| December 1, 2021 | 125,000 | $192.82 | $24,102,500 |
| January 3, 2022 | 91,665 | $150.38 | $13,784,857 |
| February 1, 2022 | 91,665 | $109.40 | $10,028,059 |
| March 1, 2022 | 133,038 | $158.33 | $21,063,507 |
| April 1, 2022 | 91,665 | $108.67 | $9,960,777 |
| May 2, 2022 | 45,833 | $80.00 | $3,666,640 |
| May 2, 2022 | 45,833 | $80.00 | $3,666,640 |

His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

54. The 2022 Proxy Statement said the following of Defendant Girouard, in relevant part:

> Mr. Girouard is one of our co-founders and has served as our Chief Executive Officer and a member of our Board since our incorporation. From February 2004 to April 2012, Mr. Girouard served in various roles at Alphabet Inc. (formerly Google Inc.), most recently as President of Google Enterprise, where he helped build Google's cloud applications business worldwide, including product development, sales, marketing, and customer support. He started his career in Silicon Valley as a Product Manager at Apple, a technology company, and previously served as an associate in the consulting firm Booz Allen's Information Technology practice. Mr. Girouard's career began in software development with the Boston office of Accenture, a consulting firm. He graduated from Dartmouth College with an A.B. in Engineering Sciences and a B.E. in Computer Engineering. Mr. Girouard also holds an M.B.A. from the University of Michigan with High Distinction.

**Defendant Gu**

55. Defendant Paul Gu ("Gu") is a Company co-founder, the Senior Vice President of Product and Data Science, and has served as a Company director since April 2015. According to the 2022 Proxy Statement, as of March 15, 2022, Defendant Gu beneficially owned 1,699,716 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2022 was $97.48, Defendant Gu owned approximately $ 165,688,316 worth of Upstart stock.

56. For the fiscal year ended December 31, 2021, Defendant Gu received $7,925,248 in total compensation, including $409,167 in salary, $3,739,216 in option awards, and $3,183,615 in stock awards.

57. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gu made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |

| August 16, 2021 | 155,000 | $201.52 | $31,234,980 |
| September 15, 2021 | 155,000 | $269.75 | $41,810,940 |
| October 15, 2021 | 155,000 | $391.48 | $60,679,400 |
| November 15, 2021 | 39,000 | $246.94 | $9,630,660 |
| March 1, 2022 | 2,000 | $160.01 | $320,028 |

His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

58.     The 2022 Proxy Statement said the following of Defendant Gu, in relevant part:

Mr. Gu is one of our co-founders and has served in various roles since April 2012, including most recently as our Senior Vice President, Product and Data Science. He has also served as a member of our Board since April 2015. Mr. Gu has a background in quantitative finance, built his first algorithmic trading strategies on the Interactive Brokers API at the age of 20 and previously worked in risk analysis at the D.E. Shaw Group, a hedge fund, in 2011. During college, Mr. Gu led underwriting for two non-profit microlenders in the United States. Mr. Gu studied economics and computer science at Yale University and then joined the Thiel Fellowship.

**Defendant Schwartz**

59.     Defendant Robert Schwartz ("Schwartz") served as a Company director from June 2015 until his resignation on November 15, 2021. He declined to receive compensation, including equity awards, for his service as a director.

**Defendant Datta**

60.     Defendant Datta has served as the Company's CFO since December 2016. According to the 2022 Proxy Statement, as of March 15, 2022, Defendant Datta beneficially owned 1,067,712 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2022 was $97.48, Defendant Datta owned approximately $104,080,566 worth of Upstart stock.

61.     For the fiscal year ended December 31, 2021, Defendant Datta received $7,925,248 in total compensation, including $409,167 in salary, $3,739,216 in option awards, and $3,183,615

in stock awards.

62.     The 2022 Proxy Statement said the following of Defendant Datta, in relevant part:

Mr. Datta has served as our Chief Financial Officer since December 2016. From June 2005 to December 2016, he served in various roles at Alphabet Inc. (formerly Google Inc.), including as Vice President of Finance for Global Advertising, Finance Director of Corporate Revenue and Product Profitability, and in various international finance leadership positions based in Asia and Europe. Prior to Alphabet Inc., Mr. Datta worked at Artisan Capital, a private investment group, from November 2002 to May 2005, sourcing and reviewing prospective private equity investments, and worked at Deloitte Consulting, a consulting firm, from June 1996 to July 2000. Mr. Datta has a joint honors degree in Economics and Finance from McGill University in Montreal and an M.B.A. from Stanford University.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

63.     By reason of their positions as officers and directors, and/or fiduciaries of Upstart and because of their ability to control the business and corporate affairs of Upstart, the Individual Defendants owed Upstart and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Upstart in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Upstart and its shareholders so as to benefit all shareholders equally.

64.     Each director and officer of the Company owes to Upstart and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Upstart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66.     To discharge their duties, the officers and directors of Upstart were required to exercise reasonable and prudent supervision over the management, policies, controls, and

operations of the Company.

67.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Upstart, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

68.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

69.     To discharge their duties, the officers and directors of Upstart were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, officers and directors of Upstart were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Ohio, and the United States, and pursuant to Upstart's own Code of Business Conduct and Ethics ("Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Upstart conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Upstart and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Upstart's operations would comply with all applicable laws and Upstart's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.     Each of the Individual Defendants further owed to Upstart and the shareholders the duty of loyalty requiring that each favor Upstart's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Upstart and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, and directorial positions with Upstart, each of the Individual Defendants had access to adverse, non-public information about the Company.

73.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Upstart.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

19

75.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, violations of the Exchange Act, and the claims alleged in the Securities Class Action; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

76.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Upstart was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Upstart and was at all times acting within the course

and scope of such agency.

### UPSTART'S CODE OF ETHICS AND AUDIT COMMITTEE CHARTER

79. The Company's Code of Ethics (the "Code of Conduct" or "Code") states that Upstart is "committed to maintaining the highest standards of ethical conduct." Furthermore, the Code of Conduct states the Code "applies to all directors, officers, and employees of Upstart Holdings, Inc."

80. To this end, the Company "expects every employee, contractor, and consultant to read and understand this Code and its application to the performance of her or her business responsibilities."

81. Under the section, "Compliance with Laws, Rules and Regulations," the Code of Conduct instructs, in relevant part:

> All employees must respect and obey all laws when carrying out responsibilities on behalf of the Company and refrain from illegal conduct. Employees have an obligation to be knowledgeable about specific laws, rules and regulations that apply to their areas of responsibility. If a law conflicts with a policy in this Code, employees must comply with the law. Any questions as to the applicability of any law should be directed to the Responsible Officer.

> The following is a brief summary of certain topics about which employees should be aware:

> E. Insider Trading. Under federal and state securities laws, it is illegal to trade in the securities of a company while in possession of material nonpublic information about that company. Because employees will have knowledge of specific confidential information that is not disclosed outside the Company which will constitute material nonpublic information, trading in the Company's securities or in the securities of those companies with which the Company does business by employees or persons employees provide material nonpublic information to could constitute insider trading, violating the law. It is an employee's responsibility to comply with these laws and not to share material nonpublic information. Please see the Company's Insider Trading Policy for more information about our policies and procedures relating to insider trading.

82. Under the section titled "Keeping the Audit Committee Informed," the Code of Conduct provides:

The Audit Committee plays an important role in ensuring the integrity of the Company's public reports. If an employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, they should notify the Audit Committee of the Board. In particular, any employee should promptly bring to the attention of the Audit Committee any information of which they may become aware concerning:

a. the accuracy of material disclosures made by the Company in its public filings;

b. material weaknesses or significant deficiencies in internal control over financial reporting;

c. any evidence of fraud that involves an employee who has a significant role in the Company's financial reporting, disclosures or internal controls or procedures; or

d. any evidence of a material violation of the policies in this Code regarding financial reporting.

83.     Under the section, "Reporting and Other Records," the Code of Conduct states, in

relevant part:

As a financial services company, it is of critical importance that the Company's reporting to the various regulators with oversight over our business, and to our partners, be full, fair, accurate, timely and understandable. Depending on their respective positions with the Company, employees may be called upon to provide information necessary to assure that the Company's reporting meets these requirements. The Company expects employees to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's reporting requirements.

Employees are responsible for the accurate and complete reporting of financial information within their respective areas and for the timely notification to senior management of financial and non-financial information that may be material to the Company to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.

Each employee involved in the Company's disclosure process must familiarize themselves with the disclosure requirements applicable to the Company and the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.

84.     Under the section, "Reporting and Other Records," the Code of Conduct states, in relevant:

> Employees are responsible for the accurate and complete reporting of financial information within their respective areas and for the timely notification to senior management of financial and non-financial information that may be material to the Company to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.

Furthermore, each director, officer, or employee must "not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations."

85.     The Company's Audit Committee Charter also entrusts the Individual Defendants on the Audit Committee with additional responsibilities. The Audit Committee Charter states, in relevant part:

**PURPOSE**

The purpose of the Committee shall be to assist the Board in its oversight of:

1. the accounting and financial reporting processes and internal controls of the Company;

2. the audit and integrity of the Company's financial statements;

3. the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);

4. the qualifications, independence and performance of the Company's independent auditors; and

5. the design, implementation and performance of the Company's internal audit function, as applicable.

Following the Company's initial public offering, the Committee shall also be responsible for preparing the report required by the Securities and Exchange

Commission (the "SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing other duties and responsibilities as are enumerated in or consistent with this charter.

The function of the Committee is primarily one of oversight. The Company's management is responsible for preparing the Company's financial statements, and the independent auditor is responsible for auditing and reviewing those financial statements. The Committee is responsible for assisting the Board in overseeing the conduct of these activities by management and the independent auditor. The Committee is not responsible for providing any expert or special assurance as to the financial statements or other financial information provided by the Company to its stockholders or others or as to the independent auditor's work.

86.     The Audit Committee Charter also charges the Audit Committee, *inter alia*, with

the following responsibilities:

Review of Internal Controls and Integrity of Financial Statements. The Committee shall meet with management, the internal audit department, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:

 a. the scope and timing of the annual audit of the Company's financial statements;

b. the Company's annual audited and quarterly unaudited financial statements and following the Company's initial public offering, annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; if applicable, the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

c. the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;

d. the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

e. the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief

Executive Officer and Chief Financial Officer;

f. any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

g. any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

h. any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

i. any other material written communications between the independent auditor and management, including, but not limited to, the management letter and schedule of unadjusted differences;

j. the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

k. any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management

\*       \*       \*

4. Review of Financial Information Presentation, Earnings Press Releases and Guidance. The Committee shall periodically discuss with management the Company's procedures with respect to the presentation of the Company's financial information (paying attention to any use of "pro forma" or "adjusted" non-GAAP information) and review earnings press releases, earnings guidance provided to analysts and rating agencies and financial information provided to the public, analysts and ratings agencies.

\*       \*       \*

9. Compliance with Laws. On at least an annual basis, the Committee shall review and discuss with management and the independent auditor (a) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and

compliance with export control regulations and (b) reports regarding compliance with applicable laws, regulations and internal compliance programs. The Committee must discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any reports or complaints that raise material issues regarding the Company's financial statements or policies. The Committee must discuss with the Company's General Counsel any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

87.     Founded in April 2012, Upstart constructed a unique AI software to accurately identify the creditworthiness of prospective loan borrowers and optimize the loan process for lenders and lendees. The Company claims to simultaneously grant more loans and reduce defaults than traditional underwriters. On December 16, 2020, the Company went public through an IPO.

88.     The Company's AI software uses unconventional metrics to assess default risk such as where a potential borrower attended college, their GPA, their standardized test scores, and their work history, among other things, in addition to the traditional data sets such as FICO score and income.

89.     Upstart partners with banks and credit unions to furnish personal and auto loans to customers. These loans can range between $1,000 to $50,000. The annual percentage rates attached to these loans can vary widely, but generally are between 6.5% to 35.99% over a three-to-seven-year period.

90.     Upstart's business model largely relies on fees paid by banking partners. Upstart charges banks referral fees for each loan furnished through Upstart's website, "platform" fees based upon the quantity of loans referred, and loans servicing fees gathered from customers as they repay their loans.

91.     The Company underwrites loans in three ways. First, banking partners fund loans

on the bank's balance sheet. Second, for loans not kept on banks' balance sheets, Upstart finances loans through institutional investors. Third, and purportedly rarely, Upstart funds loans directly on the Company's balance sheet.

92.     For the fiscal year ended December 31, 2021 ("FY 2021"), 16% of Upstart's loans were funded by the originating bank. 80% were funded by institutional investors through Upstart's loan funding program. Upstart's business model relies on processing large amounts of loans and then shipping the loans off to its partner banks in order to avoid having to list the loans on the Company's balance sheet. Upstart maintained publicly that the Company would rarely directly fund loans on its balance sheet. In the rare cases it would use the Company balance sheet, the Company would primarily fund loans for research and development in an effort to improve the AI software's capabilities.

93.     For that reason, Upstart appeared, at first glance, as a largely safe, insulated, and low-risk investment. In addition, Upstart boasted that its AI software provides "superior loan performance" and is "significantly more accurate than traditional lending models."

94.     However, Upstart began to retain a significant amount of loans on its balance sheet, despite publicly claiming in its SEC filings and other releases that, among other things, the "percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors has generally increased."

**False and Misleading Statements**

*March 17, 2021 Earnings Call*

95.    On March 17, 2021, Upstart held an earnings call with investors regarding the Company's fourth quarter and fiscal year 2020 ("FY 2020") results. During the call, Defendant Girouard stated that "Upstart is a fee-based business" which "do[es not] make loans." Defendant Girouard also told investors, "we aren't exposed to material balance sheet risk."

96.    In the call, Defendant Girouard asserted that the Company's AI software had special ability to identify loan default risks and avoid them, saying the identification of default risk is "the centerpiece of our system" and that "[i]t predicts not just the likelihood that a loan will default, but when that default can be expected to happen." Consequently, the Company possesses unique advantages of "higher approval rates, lower loss rates and a highly automated digital experience" which provides "lending programs that are more predictable, more profitable, and more inclusive."

97.    Defendant Datta, Upstart's CFO, also spoke during the earnings call. Defendant Datta told investors that the Company's aggregate balance of loans, notes, and residuals on its balance sheet was $98 million at the end of FY 2020, which was down from $266 million at the end of 2019. In answering a question posed by an analyst regarding the securitization of loans underwritten by Upstart, Defendant Datta boasted that Upstart's health "is as good as it's ever been with respect to demand for loans on the funding side" and that "funding has not been an obstacle to [Upstart's finances] in any way."

*March 18, 2021 10-K*

98.    On March 18, 2021, Upstart filed its annual report on Form 10-K ("2021 10-K") with the SEC, which reported on the fiscal year ended December 31, 2020, and expanded on the information from the March 17, 2021 earnings call. In relevant part, the Company stated "[w]e are

a leading, cloud based AI lending platform. AI lending enables a superior loan product with improved economics that can be shared between customers and lenders…Consumers on our platform benefit from higher approval rates, lower interest rates, and a highly automated, efficient, all-digital experience."

99.     The 2021 10-K also discussed the retention of loans and the Company's aversion to maintaining loans on the Company's balance sheet. Here, the Company proclaims that 98% of its loans are not on Upstart's balance sheet:

> Loans issued through our platform can be retained by our originating bank partners, distributed to our broad base of institutional investors and buyers that invest in Upstart-powered loans or funded by Upstart's balance sheet. In the year ended December 31, 2020, 21% of the loans funded through our platform were retained by the originating bank and 77% of loans were purchased by institutional investors through our loan funding programs.

### *May 11, 2021 Earnings Call*

100.    On May 11, 2021, Upstart held an earnings call with investors regarding the Company's first quarter of 2021 results. During the call, Defendant Girouard touted Upstart's stability, saying the Company is "primarily technology and model-driven, which manifests as increasing conversion rates in our borrower funnel." He also spoke about improvements the Company made to the AI software during the previous quarter, stating "[t]his upgrade led to higher approval rates and lower interest rates which, of course, translates into more loans." When an analyst asked Defendant Girouard about the how the upgrades created higher loan conversion rates, he responded that Upstart's AI "gets smarter about separating good credits from bad credits" and therefore it "helps us avoid offering loans to those who are more likely to default and the effect of that, which is the most basic sort of building block of our business, is that it allows us to approve more people at generally lower rates."

101. Defendant Datta told investors that the Company's aggregate balance of loans, notes, and residuals had dropped to $73.2 million, down from $227.5 million from the same quarter a year prior. He further represented to investors that Upstart planned a "continuing reduction in the percentage of platform loans funded through our own balance sheet."

### May 14, 2021 10-Q

102. On May 14, 2021, Upstart filed a quarterly report for the quarter ended March 31, 2021 on Form 10-Q ("Q1 10-Q 2021") with the SEC, which expanded on the information from the May 11, 2021 earnings call. The Q1 10-Q 2021 posited that "AI lending will become increasingly critical as this industry continues to undergo a broad digital transformation."

103. The Q1 10-Q 2021 further states that "[o]ver the last few years, the percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors and loans retained by the bank partners has generally increased."

### June 9, 2021 Bank of America Global Technology Conference

104. On June 9, 2021, Defendant Girouard attended the Bank of America Global Technology Conference. During the conference, Defendant Girouard stated that since the Company's revenue "is almost entirely fees paid to [the Company] by banks not subject to claw-backs," Upstart's revenue generating capabilities are not "anything related to quality of credit performance." He further said that the Company had "a great proof point that a model like ours actually can handle disruptions in the economy and dislocations better than a standard model."

105. When an analyst asked Defendant Girouard about how the Company could weather a credit cycle, he replied, [c]redit quality is the sort of true north of the company" and that Upstart's AI software is capable of dealing with "disruptions in the economy." Defendant Girouard went on

to say the AI software could handle a "recession far better than a traditional system would" since "it can very quickly adjust itself to handle the macro situation that is evolving out there."

### *August 10, 2021 Earnings Call*

106.    On August 10, 2021, Upstart held an earnings call with investors regarding the Company's second quarter of 2021 results. During the call, Defendant Girouard told investors that the Company's "more powerful algorithms and growth in training data led to a boost in approval rate and a more accurate system overall" and "continued to drive separation between our AI-powered platform and more conventional lending systems."

107.    Later in the earnings call, Defendant Datta spoke about the health of Upstart's balance sheet, saying, "[i]n terms of loan assets, [the Company] carried an aggregate balance of loans, notes, and residuals of $95.3 million," which was higher than the $73.2 million in the first quarter of 2021, but lower than the $148 million at the end of the second quarter of the prior year. Defendant Datta concluded by saying to investors that "these loan assets represent the totality of the direct exposure we have to credit risk."

### *August 13, 2021 10-Q*

108.    On August 13, 2021, Upstart filed a quarterly report for the quarter ended June 30, 2021 on Form 10-Q ("Q2 10-Q 2021") with the SEC, which expanded on the information from the August 10, 2021 earnings call. The Q2 10-Q 2021 posited that "AI lending will become increasingly critical as this industry continues to undergo a broad digital transformation."

109.    The Q2 10-Q 2021 further states that "[o]ver the last few years, the percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors and loans retained by the bank partners has generally increased."

***September 9, 2021 Deutsche Bank Technology Conference***

110.    On September 9, 2021, Defendant Girouard attended the Deutsche Bank Technology Conference. While there, he gloated that Upstart's AI software is the "Holy Grail of credit and lending" and that Upstart was "developing models for credit origination that are more accurately measuring risk than the legacy systems, which tend to be FICO centric" so that Upstart is "able to approve more borrowers at lower rates and actually, lower loss rates."

111.    In respect to the Company's exposure to credit risk, Defendant Girouard reassured investors that "we don't take risk in loans" because "we aren't in any sense a lender ourselves." Instead, he said "[w]e provide a toolset to banks to originate credit and charge them fees to use it."

112.    In response to a question about Upstart's advantage over its competitors, Defendant Girouard replied, Upstart's "product that can approve more borrowers at lower rates" is "a fairly magical thing" because the AI software "is always getting better" and the Company is "getting more sophisticated AI as we go and our model is inevitably getting more accurate as time goes by."

***November 9, 2021 Earnings Call***

113.    On November 9, 2021, Upstart held an earnings call with investors regarding the Company's third quarter of 2021 results. During the call, Defendant Datta told investors that the uptick in the aggregate balance of loans, notes, and residuals on the Company's balance sheet had rose to $140 million, which was significantly higher than the $95.3 million from the prior quarter, yet still lower from the $145 million figure from the same time a year prior. Defendant Datta explained that the reason "the dollar volume of loans we carry is edging upwards" was due to Upstart's "use [of] our balance sheet to support the scaling of our growing auto product, as well as our expansion into the lower credit score segments of personal lending."

114. Defendant Girouard, in answering an analyst's question pertaining to the demand to fund Upstart-powered loans, stated that Upstart would not be subject to credit risk because the Company has "[a] lot of banks who are originating loans for their own balance sheets" in addition to "banks that are selling through to 100-plus, 150-plus capital markets, partners," which creates a "very liquid environment."

115. Defendant Datta added, "even when we're past the current…distortion in the market, we'll be in pretty good shape with respect to demand."

***November 12, 2021 10-Q***

116. On November 12, 2021, Upstart filed a quarterly report for the quarter ended September 30, 2021 on Form 10-Q ("Q3 10-Q 2021") with the SEC, which expanded on the information from the November 9, 2021 earnings call. The Q3 10-Q 2021 posited that "AI lending will become increasingly critical as this industry continues to undergo a broad digital transformation."

117. The Q3 10-Q 2021 further states that "[o]ver the last few years, the percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors and loans retained by the bank partners has generally increased."

***February 15, 2022 Earnings Call***

118. On February 15, 2022, Upstart held an earnings call with investors regarding the Company's fourth quarter of 2021 results. During the call, Defendant Datta told investors that Upstart was "cognizant of the fluidity in the macro environment," and the Company was "not expecting any meaningful adverse impact from rising defaults on our volumes or economics" because "[i]t's not…a longer term…increase in default profile."

119.     Defendant Datta told investors that the uptick in the aggregate balance of loans, notes, and residuals on the Company's balance sheet had ballooned to $261 million, up from $140 million from the prior quarter. He asserted that the rise "reflect[ed] the accelerated pace of [research and development]" and was the consequence of Upstart's reinvestment of $170 million "in the form of loans made in support of new" research and development programs.

120.     Despite this massive rise in the balance sheet, Upstart told investors it forecast revenue of $1.4 billion in 2022.

***February 18, 2022 10-K***

121.     On February 18, 2022, Upstart filed its annual report on Form 10-K ("2022 10-K") with the SEC, which reported on the fiscal year ended December 31, 2021, and expanded on the information from the February 15, 2022 earnings call. In relevant part, the Company stated "[w]e are a leading, cloud based AI lending platform. AI lending enables a superior loan product with improved economics that can be shared between customers and lenders…Consumers on our platform benefit from higher approval rates, lower interest rates, and a highly automated, efficient, all-digital experience."

122.     The 2022 10-K also discussed the retention of loans and the Company's aversion to maintaining loans on the Company's balance sheet. Here, the Company proclaims that 96% of its loans are not on Upstart's balance sheet:

> Loans issued through our platform can be retained by our originating bank partners, distributed to our broad base of institutional investors and buyers that invest in Upstart-powered loans or funded by Upstart's balance sheet. In the year ended December 31, 2021, 16% of the loans funded through our platform were retained by the originating bank and 80% of loans were purchased by institutional investors through our loan funding programs.

*March 9, 2022 Morgan Stanley Media and Telecom Conference*

123.    On March 9, 2022, while attending the Morgan Stanley Media and Telecom Conference, Defendant Girouard boasted about Upstart's capability to thrive during poor economic conditions, saying "volatility and turbulence…is an environment that we shine in" and "more noise, more volatility ends up being a good thing for us as a company because we can handle it, manage it better than others," especially since "we're a very lightweight company" with a "small balance sheet."

124.    Defendant Girouard went on to tell investors, "we're a company that thrives in this type of environment and we will, without question, come out stronger on the other side."

*April 5, 2022 Proxy Statement*

125.    On April 5, 2022, Upstart filed the 2022 Proxy Statement on Schedule 14A with the SEC. Defendants Huber, Cooper, Cassidy, Terry, Hentges, Schwartz, O'Kelly, Girouard, and Gu solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

126.    The 2022 Proxy Statement called for Company shareholders to, *inter alia*: (1) reelect Defendants Cassidy and Gu to serve staggered terms on the Board; (2) ratify the appointment of Deloitte & Touche LLP as the Company's registered public accounting firm; (3) approve, on an advisory basis, the frequency of future stockholder advisory votes on the compensation of the Company's named executive officers; and (4) transact such other business as may properly come before the meeting.

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2022 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

127.    The 2022 Proxy Statement also detailed the principal functions of the Audit Committee, which at that time consisted of Defendants Terry, Hentges, and O'Kelly. These functions included the following:

- Selecting a qualified firm for accounting purposes to audit the Company's financial statements;

- Help to ensure the independence and performance of the public accounting firm;

- Discuss the scope and results of the audit with the public accounting firm, and review with management and independent public accounting firm, the Company's interim and year-end results of operation;

- Develop procedures for employees to submit concerns anonymously about question accounting or audit matters;

- Review the Company's polices on risk assessment and risk management;

- Review related party transactions; and

- Approve, or pre-approve, all audit and permissible non-audit services to be performed by the independent public accounting firm.

128.    Additionally, under the heading entitled "Role of our Board in Risk Oversight," the 2022 Proxy Statement stated the following:

We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day oversight and management of strategic, operational, legal and regulatory compliance, cybersecurity, and financial risks, while our Board, as a whole and assisted by its committees, has responsibility for the oversight of our risk management framework, which is designed to identify, assess, and manage risks to which our company is exposed. Consistent with this approach, our Board regularly reviews our strategic and operational risks in the context of discussions with management, question and answer sessions, and reports from the management team at each regular board meeting. Our board also receives regular reports on all significant committee activities at each regular board meeting and evaluates the risks inherent in significant transactions.

129. The 2022 Proxy Statement, in the same section, also outlined the responsibilities and obligations of the Board's committees in respect to risk management and oversight:

> In addition, our Board has tasked designated standing committees with oversight of certain categories of risk management. Our audit committee assists our board in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures, as well as legal and regulatory compliance and potential conflicts of interest. The audit committee also oversees our enterprise-risk management program, as well as our initiatives related to cybersecurity. Further, our audit committee, among other things, discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our compensation committee assesses risks relating to our executive compensation plans and arrangements. Our nominating and corporate governance committee assesses risks relating to our corporate governance practices and the independence of the board. Our Board believes its current leadership structure supports the risk oversight function of the board.

130. The 2022 Proxy Statement further stated that the Company has a "competitive advantage" because of its accurate "AI models."

131. The above statements in the 2022 Proxy Statement were false and misleading because they failed to disclose that: (1) contrary to the 2022 Proxy Statement's description of Upstart's Audit Committee's responsibilities, Upstart's Audit Committee was not adequately exercising these functions, was causing or permitting Upstart to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the 2022 Proxy Statement; and (3) contrary to the 2022 Proxy Statement's description regarding the risk oversight function of the Board, the Board would utterly fail in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties.

132.   The above statements in the 2022 Proxy Statement were false and misleading because they also failed to disclose that (1) Upstart's AI software was incapable of considering several relevant and important factors in determining loan creditworthiness; (2) as a result, Upstart faced harmful effects on its conversion rate; (3) as a result, Upstart would increasingly rely on its balance sheet to fund loans; (4) due to the foregoing, the Individual Defendants misrepresented the Company's true capabilities in approving and executing loans; and (6) the Company failed to maintain internal controls. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

133.   As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders: (1) reelected Defendants Cassidy and Gu to the Board, which allowed them to breach their fiduciary duties to the Company; and (2) approved, on an advisory basis, the frequency of future stockholder advisory votes on the compensation of named executive officers based on materially false and misleading statements regarding the Company's business and financial prospects.

134.   The aforementioned statements about Upstart's low credit risk, its business prospects, and its business operations, including the Company's 2022 revenue forecasts, were materially false and misleading. All of the statements referenced in ¶¶ 95-130 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, inter alia, that (i) Upstart's AI software was incapable of considering several relevant and important factors in determining loan creditworthiness; (ii) Upstart faced harmful effects on its conversion rate; (iii) Upstart would increasingly rely on its balance sheet to fund loans; (iv) the Company's true capabilities in approving and executing loans; and (v) the Company's internal

controls over financial reporting were woefully inadequate; and (vi) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

#### *May 9, 2022 Press Release*

135.     On May 9, 2022, Upstart issued a press release revealing the first quarter of 2022, and along with it, the truth. The press release revealed that the balance of loans, notes, and residuals held on the Company's balance sheet had more than doubled in just one quarter, from approximately $261 million for the quarter ended December 31, 2021 to more than $604 million for the quarter ended March 31, 2022.

136.     The release also announced that the Company was revising its financial outlook for 2022 by cutting the revenue forecast to $150 million, from $1.4 billion to $1.25 billion. The Company also axed the second quarter of 2022 revenue projection, changing it to between $295 and $305 million. The second quarter of 2022 revenue cut missed analysts' protections by approximately $35 million.

#### *May 9, 2022 Earnings Call*

137.     The same day, on May 9, 2022, Upstart held an earnings call with investors and analysts. During the call, Defendant Girouard admitted that Upstart "observed more volatility" for loans financed by institutional investors. Defendant Girouard faulted "the abrupt termination of [COVID-19 stimulus money] programs [which] caused some of the more recent vintages to underperform."

138.     Defendant Datta conceded that the sharp increase in loans on the Company's balance sheet was due to the more frequent "default rates" on loans beginning in the latter half of 2021. He stated that "the macro environment has become an increasing headwind to growth this

past quarter, with both rising interest rates and rising consumer delinquencies putting downward pressure on conversion."

139.    Defendant Datta further stated that despite the Company's balance sheet previously was "almost exclusively for the purposes of [research and development]" of improving loan services, Upstart began funding loans on its balance sheet as a "market-clearing mechanism" to stabilize the Company. Datta also revealed during the call that Upstart altered, or "loosened," its loan modification policy by allowing more borrowers to receive forbearance on late payments, thereby converting "delinquent" loans to "current" loans in the process.

140.    On this news, Upstart's stock price dropped by $43.52 per share, or 56%, to close at $33.61 on May 10, 2022, significantly lower than the $77.13 price per share a day earlier. In addition, the price of the Company's Convertible Senior Notes fell by $13.37, or 18.2%, when considering the last trade price on May 9, 2022 before the Company's press release and last trade price on May 10, 2022, after the Company released the information.

141.    A day after the earnings call and press release, on May 10, 2022, Jim Cramer, the CNBC *Mad Money* host, interviewed Defendant Girouard. During the interview, Cramer exclaimed he "was shocked at the…potentially bad loans on [the Company's] balance sheet." Cramer went on to say that it is "certainly ill-advised to have that many loans on the [Upstart's] balance sheet." Cramer further stated that "a lot of bankers tell me it was because [the Company] couldn't get rid of them."

### *May 10, 2022 Wedbush Securities Report*

142.    On May 10, 2022, a private wealth management investment firm, Wedbush Securities, issued a report on recent developments from Upstart. The report stated that "[w]hile the Company claims that its decision to keep more loans on-balance sheet was used as a market

clearing mechanism due to interest rate moves, we see this as a divergence from its capital-light business model and could indicate [the Company] has few alternatives other than to hold more loans due to funding issues."

### May 13, 2022 Wedbush Securities Report

143. Three days later, on May 13, 2022, Wedbush Securities published another report. This report focused on Upstart's alterations in its loan policies regarding what constitutes a delinquent loan. The report noted that the change in policy caused the rise in loan modifications between March 2022 and April 2022 and further stated "these increases in loan modifications could be enough to avoid tripping early triggers in the near term since delinquent borrowers who opt-in to the loan modification program are reclassified to 'current' status."

## DAMAGES TO UPSTART

144. As a direct and proximate result of the Individual Defendants' conduct, Upstart has lost and expended, and will lose and expend, many millions of dollars.

145. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers and directors, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

146. Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

147. As a direct and proximate result of the Individual Defendants' conduct, Upstart has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment and other violations of law.

## DERIVATIVE ALLEGATIONS

148.    Plaintiff brings this action derivatively and for the benefit of Upstart to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Upstart, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

149.    Upstart is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

150.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Upstart. Plaintiff will adequately and fairly represent the interests of Upstart in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

151.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

152.    A pre-suit demand on the Board of Upstart is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu (the "Directors"). Plaintiff needs only to allege demand futility as to four of these eight Directors.

153.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while five of them engaged in insider sales

based on material non-public information, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

154.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

155.     Additional reasons that demand on Defendant Huber is futile follow. Defendant Huber has served as a Company director since June 2021. He also serves as a member of the Nominating and Corporate Governance Committee. In addition, Defendant Huber solicited the 2022 Proxy Statement, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Huber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.     Additional reasons that demand on Defendant Cooper is futile follow. Defendant Cooper has served as a Company director since March 2021. She also serves as the Chair of the Compensation Committee. Furthermore, the 2022 Proxy Statement, which contained false and misleading statements, was solicited on her behalf. As a trusted Company director, she conducted

little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Cooper breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Cassidy is futile follow. Defendant Cassidy has served as a Company director since February 2020. She also serves as a member of the Compensation Committee. Defendant Cassidy has received and continues to receive significant compensation for her role as a director as described herein. She benefited from the 2022 Proxy Statement, containing false and misleading statements, which led to her reelection to the Board and allowed her to breach her fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Cassidy engaged in insider trading, selling 5,000 shares of Upstart common stock for proceeds in excess of $1.08 million while the share price of Upstart's common stock was artificially inflated. For these reasons, Defendant Cassidy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Terry is futile follow. Defendant Terry has served as a Company director since February 2019. He also serves as the Chair of the Audit Committee. Defendant Terry has received and continues to receive significant compensation for his role as a director as described herein. Furthermore, the 2022 Proxy Statement, which

contained false and misleading statements, was solicited on his behalf. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Terry engaged in insider trading, selling 60,000 shares of Upstart common stock for proceeds in excess of $16.06 million while the share price of Upstart's common stock was artificially inflated. For these reasons, Defendant Terry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Hentges is futile follow. Defendant Hentges has served as a Company director since December 2019. She also serves as a member of the Audit Committee. Defendant Hentges has received and continues to receive significant compensation for her role as a director as described herein. Furthermore, the 2022 Proxy Statement, which contained false and misleading statements, was solicited on her behalf. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Hentges engaged in insider trading, selling 30,000 shares of Upstart common stock for proceeds in excess of $7.37 million while the share price of Upstart's common stock was artificially inflated. For these reasons, Defendant Hentges breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant O'Kelly is futile follow. Defendant

O'Kelly has served as a Company director since April 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant O'Kelly has received and continues to receive significant compensation for his role as a director as described herein. Furthermore, the 2022 Proxy Statement, which contained false and misleading statements, was solicited on his behalf. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant O'Kelly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Girouard is futile follow. Defendant Girouard is a co-founder of Upstart, having served as the CEO since the Company began. Defendant Girouard has received and continues to receive significant compensation for his role as a director as described herein. As a trusted Company officer, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Girouard engaged in insider trading, selling 1.15 million shares of Upstart common stock for proceeds in excess of $207.6 million while the share price of Upstart's common stock was artificially inflated. Moreover, Defendant Girouard is also a defendant in the Securities Class Action. For these reasons, Defendant Girouard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Gu is futile follow. Defendant Gu is

a co-founder of Upstart, is currently the Company's Senior Vice President of Product and Data Science and has served as a Company director since April 2015. Defendant Gu has received and continues to receive significant compensation for his role as a director as described herein. He benefited from the 2022 Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. As a trusted Company officer and director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Gu engaged in insider trading, selling 506,000 shares of Upstart common stock for proceeds in excess of $143.63 million while the share price of Upstart's common stock was artificially inflated. For these reasons, Defendant Gu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163. Additional reasons that demand on Defendant Datta is futile follow. Defendant Datta has served as the Company's CFO since December 2016. Defendant Datta has received and continues to receive significant compensation for his role as CFO as described herein. As a trusted Company officer, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Datta is also a defendant in the Securities Class Action. For these reasons, Defendant Datta breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164. Defendants Terry, Hentges, and O'Kelly (the "Audit Committee Defendants")

served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's internal accounting and financial controls, the Company's risk management and assessment pertaining to, *inter alia*, the financial, operational, accounting, and tax matters of the Company, the organization and performance of the Company's internal audit function, and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to fulfill these obligations, as they are charged to do under the Audit Committee Charter, allowing the Company to issue materially false and misleading statements to the public during the Relevant Period and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

165.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Girouard and Gu have concurrently served on the board of directors and/or as managers of the same company over the course of the past seven years. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

166.    In violation of the Code of Conduct and the Audit Committee Charter, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, violations of the Exchange Act, and the claims alleged in the Securities Class Action. In violation of the Code of Conduct and the Audit Committee Charter, the Directors failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

167. Upstart has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Upstart any part of the damages Upstart suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

168. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

169. The acts complained of herein constitute violations of fiduciary duties owed by Upstart officers and directors, and these acts are incapable of ratification.

170. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability

insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Upstart. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Upstart, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

171.    If there is no directors' and officers' liability insurance, then the Directors will not cause Upstart to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

172.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu
for Violations of
Section 14(a) of the Exchange Act**

173.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

175.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

176.    Under the direction and watch of the Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu, the 2022 Proxy Statement failed to disclose, *inter alia*: (1) contrary to the 2022 Proxy Statement's description of Upstart's Audit Committee's responsibilities, Upstart's Audit Committee was not adequately exercising these functions, was causing or permitting Upstart to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the 2022 Proxy Statement; and (3) contrary to the 2022 Proxy Statement's description regarding the risk oversight function of the Board, the Board would utterly fail in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties.

177.    Furthermore, under the direction of the Defendants Huber, Cooper, Cassidy, Terry,

Hentges, O'Kelly, Girouard, and Gu, the 2022 Proxy Statement failed to disclose, *inter alia*: (1) Upstart's AI software was incapable of considering several relevant and important factors in determining loan creditworthiness; (2) as a result, Upstart faced harmful effects on its conversion rate; (3) as a result, Upstart would increasingly rely on its balance sheet to fund loans; (4) due to the foregoing, the Individual Defendants misrepresented the Company's true capabilities in approving and executing loans; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

178.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including, but not limited to, the re-election of Defendants Cassidy and Gu to the Board, and allowing the Individual Defendants to receive further unjust compensation.

179.     The Company was damaged as a result of Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu's material misrepresentations and omissions in the 2022 Proxy Statement.

180.     Plaintiff on behalf of Upstart has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

181.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Upstart's business and affairs.

183.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

184.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Upstart.

185.    In breach of their fiduciary duties owed to Upstart, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Upstart's AI software was incapable of considering several relevant and important factors in determining loan creditworthiness; (2) as a result, Upstart faced harmful effects on its conversion rate; (3) as a result, Upstart would increasingly rely on its balance sheet to fund loans; (4) due to the foregoing, the Individual Defendants misrepresented the Company's true capabilities in approving and executing loans; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

186.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

187.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal

controls.

188.    Moreover, during the Relevant Period, five of the Individual Defendants breached their fiduciary duties by engaging in insider sales for proceeds in excess of $375 million.

189.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

190.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

191.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Upstart has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192.    Plaintiff on behalf of Upstart has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

193.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Upstart.

195. The Individual Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Upstart that was tied to the performance or artificially inflated valuation of Upstart, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

196. Plaintiff, as a shareholder and a representative of Upstart, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

197. Plaintiff on behalf of Upstart has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

198. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Upstart, for which they are legally responsible.

200. As a direct and proximate result of the Individual Defendants' abuse of control, Upstart has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

201. Plaintiff on behalf of Upstart has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

202.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

203.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Upstart in a manner consistent with the operations of a publicly-held corporation.

204.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Upstart has sustained and will continue to sustain significant damages.

205.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

206.     Plaintiff on behalf of Upstart has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

207.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Upstart to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products and services.

209.     As a result of the waste of corporate assets, the Individual Defendants are each

liable to the Company.

210.    Plaintiff on behalf of Upstart has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Girouard and Datta for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

211.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

212.    Defendants Girouard and Datta are each named as defendants in the Securities Class Action, which variously assert claims under the federal securities laws for violations of Sections 10(b), 14(a), 20(a), and 20A of the Exchange Act, as well as Rules 10b-5 and 14a-9 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Girouard and Datta's willful and/or reckless violations of their obligations as officers and directors of Upstart.

213.    Defendants Girouard and Datta, because of their positions of control and authority as officers and directors of Upstart, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Upstart, including the wrongful acts complained of herein and in the Securities Class Action.

214.    Accordingly, Defendants Girouard and Datta are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

215.    As such, Upstart is entitled to receive all appropriate contribution or indemnification from Defendants Girouard and Datta.

## **PRAYER FOR RELIEF**

216. FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Upstart, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Upstart;

(c) Determining and awarding to Upstart the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Upstart and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Upstart and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Upstart to nominate at least two candidates for election to the Board; and

3. a proposal to remove the staggered board election process;

4. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Upstart restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

*/s/ Stuart G. Torch*
One of the attorneys for Plaintiff

Dated: October 7, 2022                    Respectfully submitted,

*/s/ Stuart G. Torch*
Stuart G. Torch (0079667)
stuart@employmentlawpartners.com
David N. Truman (0082347)
david@employmentlawpartners.com
EMPLOYMENT LAW PARTNERS, LLC
4700 Rockside Road, Suite 530
Independence, Ohio 44131
216.382.2500 (voice)
216.381.0250 (facsimile)

*Local Counsel for Plaintiff*

*/s/ Timothy Brown*
THE BROWN LAW FIRM, P.C.
Timothy Brown (New York Bar No. 4301495)
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

***PRO HAC VICE ADMISSION ANTICIPATED***
*Lead Counsel for Plaintiff*